## Catholic Cemeteries Association of the Diocese of Pittsburgh Zoning Case.

Argued October 5, 1954. Before STERN, C. J., STEARNE, JONES, CHIDSEY, MUSMANNO and ARNOLD, JJ.

518

*John A. Metz, Jr.,* with him *Metz, McClure, Hanna & MacAlister,* for appellant.

*Joseph R. Doherty,* with him *McCloskey, Best & Leslie, J. Frank McKenna, Jr., Clair V. Duff* and *Charles E. Hawkins,* for appellees.

OPINION BY MR. JUSTICE ALLEN M. STEARNE, November 22, 1954:

The appeal of the Township of Upper St. Clair is from the order of the court below directing the Board of Adjustment of Upper St. Clair Township to grant a certificate and permits to the Catholic Cemeteries Association of the Diocese of Pittsburgh and of Margaret E. Houston, Florence C. Riles and John R. Houston (appellees), for the use of approximately 185 acres of land in the Township as a cemetery. It is contended that the court below did not properly exercise its reviewable powers within the scope statutorily prescribed for appeals from a zoning board of adjustment.

On December 27, 1952, the Catholic Cemeteries Association of the Diocese of Pittsburgh, an appellee, acquired an option to purchase an area of approximately 185 acres of land known as the Houston Farm in the southwestern part of the Township containing in all about ten square miles. The Association then filed with the Board of Supervisors its application for a permit to lay out and establish a cemetery. At a regular meeting of the Board, a public hearing was held on a proposed ordinance which would amend the zoning law to allow non-profit cemeteries within the area "at such location as shall be permitted by the Board of Supervisors". The Board of Supervisors, by vote, refused to pass or adopt the proposed ordinance. An appeal was then taken to the Board of Adjustment. The permit was again

refused, upon three grounds: (1) because the requested use was not within those permitted (2) to grant such permit as an exception or a variance would, in effect, be a re-zoning of the district which was beyond the power of the Board and (3) because the Board of Supervisors, in refusing to amend the Zoning Ordinance, clearly indicated the attitude of that legislative body concerning the requested use. This decision was reversed by the County Court of Allegheny County upon appeal and the Zoning Board of Adjustment was ordered and directed to grant the desired certificate and permits. The court below held that a literal enforcement of the provisions of the Ordinance would result in unnecessary hardships; that the variance is not contrary to the public interest; that the neighboring property owners are not sufficiently offended or hurt by the use of the land as a cemetery; and that the action of the Zoning Board of Adjustment was arbitrary, capricious and could not be sustained.

The Zoning Ordinance provides for three use districts: (a) Single Family Dwelling Districts (b) Multiple Dwelling Districts and (c) Commercial Districts. The Houston Farm is within the Single Family Dwelling District. In such district it was provided that land may be used and buildings may be erected, altered or used for single family dwellings, with garages, fences, and similar uses. Also, within the district, land may be used for farming with all of its necessary incidents. Churches and public schools are permitted at such locations authorized by the Board of Supervisors. Cemeteries are not mentioned in the Ordinance. Certain uses, such as slaughter houses, fertilizer manufacture, etc., are prohibited within the Township.

The grant of a certificate for the intended use must be predicated on a valid variance from the terms of the ordinance. The distinction between a variance and an

exception is set forth in *Devereux Foundation, Inc., Zoning Case,* 351 Pa. 478, 41 A. 2d 744, where it is said (p. 483) : ". . . An 'exception' in a zoning ordinance is one allowable where facts and conditions detailed in the ordinance, as those upon which an exception may be permitted, are found to exist. But zoning ordinances usually provide, as does the present one, for another kind of dispensation, also permitted by the statute, by which a 'variance' from the terms of the ordinance may be authorized in cases where a literal enforcement of its provisions would result in unnecessary hardship. . . ." There are no facts and conditions detailed in this Ordinance permitting any *exception* in the case of a cemetery. The sole basis for the grant of such use must necessarily be a legal *variance.* Churches and public schools are the only permissible exceptions.

The power to grant variances is given to the Board of Adjustment by the Act of July 1, 1937, P. L. 2624, sec. 7, later re-enacted and amended by the Act of July 10, 1947, P. L. 1481, art. XX, sec. 2007, known as The Second Class Township Code, 53 PS 19093-2007. Section 2007 states: "Appeals to the board of adjustment may be taken by any person . . . aggrieved or affected by any . . . decision of [the supervisors] . . . The Board of Adjustment shall have the following powers: . . . (3) To authorize, upon appeal, in specific cases such variance from the terms of the ordinance as will not be contrary to public interest, where owing to special conditions a literal enforcement of the provisions of the ordinance will result in unnecessary hardship, and so that the spirit of the ordinance shall be observed and substantial justice done." The action of the Board of Adjustment in refusing a variance was correct. To grant a variance for an area of 185 acres would, in effect, constitute a re-zoning of the area.

This principle was recognized in *Lukens v. Ridley Township Zoning Board of Adjustment*, 367 Pa. 608, 80 A. 2d 765, where it was said (p. 613) : "The Board of Adjustment was likewise correct in holding that *a rezoning and a variance are fundamentally different;* and that it has jurisdiction only when the petition is for a variance and *not where it is for a re-zoning under the guise of a variance.* The legislature expressly vested the power to zone in the Board of Township Commissioners (Act of May 27, 1949, P. L. 1955, Sec. 59, 53 P.S. §19092-3101 et seq.) and did *not 'empower a board of adjustment to set at naught the zoning statute* and ordinance under the guise of a variance': Devereux Foundation, Inc., Zoning Case, 351 Pa. 478, 485, 41 A. 2d 744. It appears that the Board of Adjustment would have the power and jurisdiction to consider, on appeal, a properly prepared petition for a variance in 1.66 acres in Tract No. 1, .29 acres in Tract No. 3, .74 acres in Tract No. 4 and .28 acres in Tract No. 5. A *petition to change and reclassify approximately 16 acres in Tract No. 2 appears, because of the large acreage involved, to be an application for re-zoning and not for a variance,* and if so, the application should be made to the Township Commissioners and not to the Board of Adjustment." (Italics in part supplied) Re-zoning is a legislative function only exercisable by the Board of Supervisors. The Supervisors had already refused an amendment to the zoning regulations. The Board of Adjustment may not usurp the legislative function of the Board of Supervisors and set at naught the provisions of the zoning ordinance under the guise of a variance: *Devereux Foundation, Inc., Zoning Case,* supra.

Furthermore, there is no evidence in the record to support the finding of the court below that to deny the requested use would result in unnecessary hard-

ship. The grant of a variance is limited to cases "where owing to special conditions a literal enforcement of the provisions of the ordinance will result in unnecessary hardship" and "will not be contrary to public interest." Many times this Court has said that in an appropriate case a variance will only be allowed when the difficulties and hardships are substantial and of compelling force: *Kerr's Appeal*, 294 Pa. 246, 253, 144 A. 81; *Valicenti's Appeal*, 298 Pa. 276, 148 A. 308; *Devereux Foundation, Inc., Zoning Case*, supra. The assertion of the court below that "a literal enforcement of the provisions of the ordinance would here result in unnecessary hardship" is substantiated by only two other statements found in its opinion. The court declared "it would *probably* be impossible to find a suitable tract of land within any reasonable distance of built-up areas that would not be in more or less proximity to residential properties", (Italics supplied) and "[t]he (owners, appellees) in the case at bar are being completely deprived of the right to sell—as to the owners—and being completely deprived, as to the corporation, of their right to dedicate, maintain and use at least an equally important use, to wit, a religious use of burial grounds." Neither of these reasons is sufficient to support the claim of hardship. That it may *probably* be impossible to find another suitable tract is not the necessary hardship envisioned by the Act. The same is true of the other argument that the seller is being deprived of his sale and the corporation of the right to use the land as burial grounds. The equivalent argument could be made by one desirous of establishing a slaughter house or a fertilizer manufacturing company.

All question of financial hardship is effectively eliminated because the appellant Cemeteries Association had but an option to purchase the land, taken

with full knowledge of the existence of the Ordinance.

The single question, however, properly before the court below was whether or not the Board of Adjustment, in refusing the variance requested, was guilty of a manifest and flagrant abuse of discretion: *Reininger Zoning Case,* 362 Pa. 116, 66 A. 2d 225. Such request was, in effect, an application for re-zoning. Furthermore, there is no evidence to support the finding of the court below that a denial of the use as a cemetery would result in unnecessary hardship. It was error to direct the issuance of the requested certificate and permits.

The order of the court below is reversed, at cost of appellees.

---

Dissenting Opinion by Mr. Justice Musmanno:

It is almost a waste of paper to write that there is nothing more certain than death. It is equally superfluous to say that no one wants to die. And it follows with the same inevitability that proper interment of the dead has an important bearing on the survival of the living. During action in the field in World War II, I always noted (with awe) that one of the vital items in battle directives carried the saddening words: "Burials will be prompt." In civilian life, reasonably prompt burials are also necessary. As death is certain and sepulture is imperative, the question propounded in this appeal is not one that can be disposed of by technical legalistic formulae and procedural rites. Values which cannot possibly be surpassed in the whole scheme of life are involved here, and we must study the record meticulously to see if law has supported reason and judicial decision has confronted fact.

Margaret E. Houston, Florence C. Riles and John R. Houston own some 185 acres of farmland in Upper

St. Clair Township, Allegheny County. They have en-tered into an agreement with the Catholic Cemeteries Association of the Diocese of Pittsburgh to sell this acreage to the Association for use as a cemetery. The Majority says this cannot be done.

Why?

Fundamentally, the Houstons can sell their prop-erty to whomever they wish. Basically, the Catholic Cemeteries Association has the right to purchase what it may pay for and to use it as it desires, so long as the use is a legal one. No one contends that there is anything illegal about a cemetery.

The Houston farm is located in what is known, under the Zoning Ordinance of Upper St. Clair Town-ship, as District U-1. The Board of Adjustment of the Township, to which application had been made for the necessary certificate and permits which would author-ize the use of the land as a cemetery, held that District U-1 limited permitted uses to: ". . . single family dwell-ings with appurtenant buildings, and accessory uses incident thereto and not involved in the conduct of a business, use for farms under certain conditions and use for churches and public schools at such locations as permitted by the Board of Supervisors upon appli-cation and hearing. The use requested in said applica-tion is clearly not included within the above permitted uses." The Board made no findings of fact or of law to justify its refusal of the application. Given the legiti-mateness and sociological correctness of a cemetery, some disabling feature must be shown before applica-tion for a variance for the purpose indicated may be summarily rejected. In the case of *Imperial Asphalt Corp. Zoning Case*, 359 Pa. 402, the Board of Adjust-ment of Manheim Township, refused the request of the owner of a grist mill to remodel and change its use. The owner appealed to the Court of Common

Pleas which took testimony but affirmed the denial of the request. On appeal to this Court, we said: "We examine the record to see whether the proceeding is free from mistake of law. The action of the zoning authorities shows that they did not comply with the law. The Act of July 1, 1937, P. L. 2624 . . . in force at the time, authorizing townships of the second class to adopt zoning regulations, provides, in section 7, P. L. 2628, 'The return [of the Board] shall concisely set forth such other facts as may be pertinent and material to show the grounds of the decision appealed from. . .' What were the 'grounds of the decision' which moved the zoning authorities? Neither the officer nor the board gave any facts pertinent and material in any inquiry into possible reasons for the conclusion reached. . . . It is not sufficient to say, as the board did in its return to common pleas, that the change is prohibited or that appellant is not entitled to a variance . . . or that the variance 'would be contrary to the public interest' or that the board reached 'a correct and just decision' . . . without something to show on what those legal conclusions are based. *It must appear that the constitutional right to the use of property has not been infringed by the* zoning regulation."* This Court there declared that since the Court of Common Pleas found that there was "no evidence that the intended use would necessarily constitute a nuisance" and that the Board had not justified its action "as the law requires," the Court of Common Pleas "should have sustained the appeal for mistake of law." We accordingly reversed and ordered the permit to issue.

In the case at bar, the County Court of Allegheny County (which has taken over the jurisdiction of the Court of Common Pleas in actions of this kind) took

---

* Italics throughout, mine.

extensive testimony; the Presiding Judge (President Judge LENCHER) examined the property involved and made findings of fact which are entirely justified by the record. President Judge LENCHER found that: 1. A literal enforcement of the ordinance would result in unnecessary hardship; 2. The refusal of the variance bore no reasonable relationship to public safety, health, morals or the general welfare; 3. No traffic hazard would result from the contemplated use of the land; 4. The action of the Board of Adjustment was arbitrary and capricious. The record amply justifies President Judge LENCHER's finding.

The Majority Opinion points out that the Act of July 1, 1937, P.L. 2624 (amended by the Act of July 10, 1947, P.L. 1481) authorizes the Board of Adjustment to grant such variances from the terms of the ordinance "as will not be contrary to public interest," and then adds that the action of the Board "in refusing a variance was correct." The Majority does not say, however, how the variance prayed for would be contrary to public interest or why unnecessary hardship does not exist.

The need for a Catholic cemetery in the area known as the South Hills is acute. There are 22 parishes in the South Hills with 19,634 known Catholic families. On the basis of an average of 4 persons to a family, cemetery space for some 78,000 inhabitants must be anticipated. Rev. Daniel A. Gearing, assigned by the Bishop of Pittsburgh to the task of finding suitable ground for a Catholic cemetery in the area under discussion, testified: "In order to serve those Catholics there are seven small Parish cemeteries which have a total of only seventeen and one-half acres of unused ground, *which is woefully inadequate to provide for the future cemetery needs of the Catholic members of the Community.*" Rev. Gearing testified further that he

employed a real estate man to survey the South Hills area "to turn up properties that might be suitable": "He spent considerable time on that and eventually presented five possible sites. Of those five sites, four were inadequate for one reason or another and *the only one that could conceivably be used with the plan I had in mind was the acreage in question here.*"

Rev. Oliver D. Keefer, Pastor of Our Lady of Grace Parish, Bower Hill Road, Scott Township, testified: ". . . The newer families and the bulk of the people who are new people who have moved out into that area have no such opportunity and when there is a burial they invariably come to me and say, 'Where can we go for a cemetery?' And I tell them they might try Bridgeville, but those are very small cemeteries and I cannot give them much encouragement because there [are] no facilities there and the only thing is to send them to a distant section in some other section of the City."

Samuel Easton, resident and property owner in Upper St. Clair Township and who owns a piece of property 1,000 feet away from the Houston Farm, testified that there was no suitable place in the area other than Houston Farm for a cemetery: "I think it right to tell you there is no suitable site in that community for a cemetery. I happen to be in business in that township and I know all the farms generally in Peters Township and I don't think there is a site you can buy for cemetery purposes there."

The Majority Opinion says that "there is no evidence in the record to support the finding of the court below that to deny the requested use would result in unnecessary hardship." I find in the record an abundance of evidence that the denial of the variance imposes hardship. Of course, there must be a meeting of the minds on what is meant by hardship. Hardship is

not restricted to physical hunger, thirst, or lack of shelter. There can be spiritual hardship which inflicts pain, distress, agony and despair far surpassing the absence of physical conveniences and comforts.

Proper burial among civilized people, and even among the most primitive tribes as well, has a spiritual significance which is as important to the survival of the human race as the hygienic considerations which call for orderly interment. Into the closed heart of the most absolute atheist and into the mind of the most uncompromising agnostic there comes, as he stands before the grave of a loved one, the promise of another springtime and the assurance of a reunion that no winter will blight. * Even without articulation, faith in immortality is natural to man. When that support fails, something weakens inside. Decent burials, comforting ceremony, scenic and restful surroundings with flowering shrubs and friendly trees are all part of the therapeutics which assuage the pain and eventually cure the wound of bereavement. All this is civilization. Thus, a well-cared-for cemetery is as necessary to the inhabitants of any community as a well-equipped hospital.

As already stated, District U-1 allows for churches, and it is not to be disputed that anything which forms part of a church's function is thus necessarily within the compass of permitted religious uses authorized in District U-1. A cemetery, which is made part of a church organization, is, because of that attachment, a religious institution in itself, even though the cemetery is not physically attached to the church. This subject came before the United States Court of Appeals (Third Circuit) in the case of *O'Leary v. Social*

---

* Standing at the bier of his brother, the justly famed Ingersoll mused: "In the night of death, hope sees a star and listening love can hear the rustle of a wing."

*Security Board,* 153 F. 2d 704. There, the plaintiff was employed by the Calvary Cemetery Association and the question arose as to whether this association was a corporation organized and operated exclusively for religious purposes. Through judicial processes unnecessary to relate here, the United States Court of Appeals, speaking through Judge GOODRICH, held that the Calvary Cemetery Association was exclusively organized and operated for a religious purpose. In a very interesting and learned Opinion, Judge GOODRICH said, inter alia: "This cemetery association was organized, as stated in §1 of Article 2 of its Constitution and By-Laws, for the 'forming and maintaining of a public cemetery for the burial of deceased Roman Catholics who may be entitled to burial according to the law, rules and regulations of the Roman Catholic Church.' The question we have before us, therefore, is whether an organization formed and maintained for this purpose is one which is engaged in an exclusively religious function, . . .

"In a chapter delineating the rights of the Catholic Church it is said, *'Nevertheless sepulture is a religious act and the cemetery is deputed a religious place.'* . . . *'Truly then, the cemeteries, in which the bodies of the faithful departed are laid to rest in such a becoming manner accompanied by the sacred rites, are intimately connected with the end of the Church.* In the first place, the character of these places is sacred. The Church demands that they be blessed according to her sacred ceremonial and to be held in reverent repute. Over "res sacrae" her dominion must be supreme. . . .' Catholic cemeteries to be recognized as such must receive constitutive blessing, either simple or solemn, and '* * * Constitutive blessing may be defined as—" 'that invocation of the Divine Name by which persons and things are detached from profane use and their condi-

tion, so as to be dedicated in perpetuity to Divine Cult as sacred persons and sacred things.' " In this light we understand by the blessing of the cemetery—that segregation of the place from its former condition by rendering it a sacred place.' . . .

"The Christian religion has elevated sepulture to a religious office; sepulture is considered as a 'res religiosa'. Secondly *it is recognized that the cemetery need not be a physical part of or adjacent to the church property.*" It is thus apparent that the Board of Adjustment, in addition to other errors, overstepped its authority in refusing a permit to a religious institution which comes clearly within the scope of regulations which govern District U-1.

The Majority Opinion states that "the single question, however, properly before the Court below was whether or not the Board of Adjustment, in refusing the variance requested, was guilty of a manifest and flagrant abuse of discretion." I do not believe that that was the only question before the lower court, but accepting for the moment that proposition to be true, the fact is that the lower court *did* find that the Board was guilty of a manifest and flagrant abuse of discretion, and there can be no doubt that the record justifies such a finding. Section 2 of the Zoning Ordinance permits in District U-1 the storage and sale of live stock, poultry, farm products, timber and farm machinery. It permits also "the drilling for oil or gas and the operation of wells supplying these products and the quarrying of stone from quarries already operated or for domestic use." The Act of July 1, 1937, *supra,* provides that in the interpretation of a zoning ordinance, "substantial justice" must be done. What kind of substantial justice is it that authorizes the necessarily noisy and odoriferous operation of gas and oil wells and prohibits the establishment of a well-

tended, beautifully landscaped and necessarily quiet cemetery?

As I indicated above I do not believe that the only question before the lower court was whether the Board had abused its discretion because, by statute and by pronouncement of this Court, the lower court had the duty to consider and dispose of the whole case on its merits. In *Dooling's Windy Hill v. Springfield Twp.*, 371 Pa. 290, 296, this Court said: "No procedural restriction, such as the appellants presently urge, impinges upon the jurisdiction of a court of common pleas on an appeal from an order of a board of adjustment. In such situation, the court is authorized by the statute (Sec. 3107) to 'reverse or affirm, in whole, or in part,' the action of the board as, to the court, 'may appear just and proper.' In short, it is the province of a court of common pleas upon an appeal from an order of a board of adjustment, *to consider and dispose of the matter on the merits*: Lindquist Appeal, supra. This is what the learned court below did in the present instance and no mistake of law in the proceeding before it is apparent."

However, whatever may have been the question before the lower court, there can be no question that the major and real question before *us* is whether the lower court was justified in its findings because, as already stated, the County Court heard the case de novo, took testimony, examined the property and entered findings of fact and conclusions of law.

In my opinion the Majority has passed over rather lightly the crucial function of this Court in review, namely, determination as to whether a lower Court has met its responsibilities in the legal issue before it. There can be no doubt that a variance was properly authorized under the findings of the Court below. The only manner in which, under our decisions, this Court

can therefore reverse the lower court's order is to substitute its findings for those of the lower court. But, by long established principle, "our review of the Court's findings is to determine whether the record is free from mistake of law." If there is "substantial evidence in support of the lower court's determination, we will not disturb its findings." (*Lindquist Appeal,* 364 Pa. 561.)

As recently as November 15, 1954, this Court, speaking through Mr. Justice BELL, said in the case of *Silverco, Inc. v. Zoning Board of Adjustment et al.,* 379 Pa. 497, that where a zoning matter comes before this Court in certiorari this Court will not reverse unless it is established that there was not sufficient evidence to support the findings of the Court below or that there was error in law or manifest abuse of discretion. None of this has happened in the case at bar. In the *Rolling Green Golf Club Case,* 374 Pa. 450, 458, Mr. Justice BELL, again speaking for the Court, said: "On appeal from a decision of a Court of Common Pleas in a zoning matter the case comes before an appellate Court as on certiorari, and where there is adequate evidence to support the findings of the Court below and the proceeding is free from error of law and there has been no manifest abuse of discretion, the decision will not be reversed."

The Majority here does not say that there is not adequate evidence to support the findings of the court below, nor does it say that the court below committed an error of law or that it was guilty of a manifest abuse of discretion. How then, under the authority quoted, can the Majority reverse the decision of the Allegheny County Court?

The Opinion of the Majority declares "That it may *probably* be impossible to find another suitable tract is not the necessary hardship envisioned by the Act."

Why can it not be? It would be difficult to visualize a more intolerable hardship striking at a community than that it should be deprived of proper burial facilities. The Majority Opinion goes on to say: "The same is true of the other argument that the seller is being deprived of his sale and the corporation of the right to use the land as burial grounds. The equivalent argument could be made by one desirous of establishing a slaughter house or a fertilizer manufacturing company." Here the Majority Opinion completely inters logic in a deep grave and buries precedent in a bottomless crypt. A slaughter house or fertilizer plant is prima facie a nuisance, especially where it is operated in a residential district, * but by no conceivable stretch of jurisprudence, obiter dictum or imagination, is a cemetery a nuisance per se. In *Young et al. v. St. Martin's Church,* 361 Pa. 505, 509, Mr. Justice STERN, now Chief Justice, said: ". . . a cemetery is not a nuisance *per se,* even though it be near to residential properties . . . As was said in the frequently cited case of Monk v. Packard, 71 Me. 309, 311, 'A repository of the bodies of the dead is as yet indispensable, and wherever located, it must *ex necessitate* be in the vicinity of the private property of some one who might prove its market value injuriously affected thereby.' Burial grounds must be established where they are reasonably accessible to surviving relatives and friends who naturally wish to visit the graves of their dear ones; they cannot, therefore, be located in the wild, and it would probably be impossible to find a suitable tract of land within any reasonable distance of built-up areas that would not be in more or less proximity to residential properties."

It is to be noted that the contemplated cemetery

---

* 66 C.J.S. 788, Nuisances, Sec. 34; *Smith v. Cummings,* 2 Pars. 92.

will have the appearance of a beautiful sylvan park. Earl O. Blair, landscape architect and graduate in Engineering and Forestry from the Ohio State University, identified pictures of the Chicago Cemetery and testified that the present cemetery would be built on exactly the same plan as that venerated burial place. The pictures which were introduced in evidence depict a panorama of evergreens, shade trees, small exquisite stone bridges, spired chapels, flower gardens and the sails of a windmill with wings silhouetted against the sky. Marble and bronze markers flush with the ground identify the graves which, contrary to old custom, are not mounds of earth but depositories covered by a living lawn level with the surrounding terrain.

There can be no cognizable fear that the presence of the cemetery contemplated in this litigation could in any way depreciate surrounding real estate values. Hugh A. Murphy, real estate broker since 1917 and member of the Real Estate Board of Pittsburgh, testified that the proposed use of the Houston Farm for cemetery purposes would not adversely affect the real estate values of property in the neighborhood. John P. Monteverde, member of the Board of Governors of the Pittsburgh Real Estate Board, testified to the same effect.

The appellant, Upper St. Clair Township, has argued and apparently convinced the Majority, that to allow a variance in this case is in effect to re-zone the Township. This argument lacks substance because, carried to its logical extreme, it would mean that variances should never be allowed. The very purpose of providing for variances in both the enabling statute and in the ordinance is to alleviate in specific cases the hardship which would result from strict compliance with the ordinance. In *Gilfillan's Permit*, 291 Pa. 358,

363, this Court said: "The ordinance here in controversy, in prescribing the powers and duties of the board of appeals, made provision for conditions such as arose in this case by giving the board power, 'in appropriate cases . . . [to] *authorize a variation of the application of the regulations herein prescribed. . .*'"

Justice KEPHART well stated the principle involved here when he said in *White's Appeal*, 287 Pa. 259, 266: "There is one matter that is quite certain, the power to thus regulate *does not extend to an arbitrary, unnecessary or unreasonable intermeddling with the private ownership of property*, even though such acts be labeled for the preservation of health, safety and general welfare. The exercise must have a substantial relation to the public good within the spheres held proper. It must not be from an arbitrary desire to resist the natural operation of economic laws or for purely aesthetic considerations."

I agree with the learned President Judge of the County Court of Allegheny County that there is no excuse whatsoever for refusing a variance here. This is not the case of disrupting a highly developed commercial area, or of encroaching upon the organized routine of a built-up area, or of interfering with the enjoyment of domestic privacy in a highly residential section. President Judge LENCHER, after inspecting the Houston Farm, said of it: "The acreages we looked at are poorly worked and undeveloped farm land. It is overrun over large areas with bushes, underbrush and wooded land. The building of the Dormont-Mt. Lebanon Sportsmen's Association on the shooting range in the interior of the property is of frame construction. Such other buildings, farm buildings near Washington Road are old, also of frame construction. The land, terrain, vicinity generally, is utterly and completely rural except that the westerly side of Washington Road (State

Highway Route 19) provides for three lanes of traffic heavily used. . . On the southerly side of Boyce Road, the Houston Farm extends the entire 5700 feet westwardly from Washington Road. It is in a state of neglect and for great distances is overgrown with underbrush, bushes and trees. The only appreciable open spaces at Boyce Road are the portions of the property used by the Sportsmen's Club for its shooting ranges. Except for the Houston Farm buildings near Washington Road and the frame buildings of the Dormont-Mt. Lebanon Sportsmen's Association in the interior of the Houston farm, there are no residences or other improvements on either side of Boyce Road for a distance in excess of a mile, . . . moving westwardly from Washington Road."

To prohibit the use of land of this character for so exalted, healthful and necessary a purpose as an estimable cemetery of the type described, can be described only in the words of Justice KEPHART as the "arbitrary, unnecessary and unreasonable intermeddling with the private ownership of property."

In *Gilfillan's Permit,* supra, the owner of a retail lumber business applied to the proper city officials in New Castle for a permit to erect a cement block warehouse. The permit was refused by the City Engineer and this refusal was upheld by the Zoning Board of Appeals appointed under the city zoning ordinance. The Court of Common Pleas of Lawrence County, after taking testimony, (as was done here) reversed the action of the Zoning Board and directed the issuance of the permit for the construction of the building. The City of New Castle appealed to this Court which, speaking through Justice FRAZER, said: ". . . inasmuch as the natural effect of ordinances of this description is to limit private rights in the interest of the public welfare, the exercise of the power must be carefully

guarded and permitted only in cases where the conditions and circumstances are such as to show the effect of the ordinance to be a reasonable and proper exercise of police power." And then, in words which could well apply to the case before us, Justice FRAZER said: "The findings of the court below expressly negative every condition required to affirmatively appear, before the action of the board refusing a permit can be sustained. Instead of being detrimental to the safety, health or morals of the community, the findings distinctly demonstrate the building in question to have the opposite effect, tending to promote the public safety, health and morals." Instead of being detrimental to the welfare of Upper St. Clair Township, the contemplated cemetery here would "have the opposite effect, tending to promote the public safety, health and morals."

I believe that, up to this point, I have shown by citation of precedent and recitation of fact, that the lower court's decision should be affirmed rather than reversed. However, if I have failed in proving my position up to this juncture, there is still another reason why, in my judgment, the plaintiffs are entitled to the relief prayed for. A township or other municipal body can constitutionally restrain or deprive an owner of the use of his land without compensation only if it is necessary for the preservation of the health, safety or morals of the community. The court below found, based upon overwhelming evidence, that the proposed cemetery will not affect or endanger the health or safety of the community. Denying, therefore, the owners of the land in question the right to sell their property for cemetery purposes is denying them the full enjoyment of their property without compensation and such an action flies in the face of constitutional prohibitions.

The case of *Medinger Appeal,* 377 Pa. 217, decided only 8 months ago, is decidedly in point. There, Springfield Township in Montgomery County enacted an ordinance which required home-builders to include a certain habitable floor area in residences to be built. Mr. and Mrs. Medinger applied for a permit for the erection of an old Colonial house which would have a floor space slightly less in size than that required by the ordinance. The building permit was refused by the Board of Adjustment. The Medingers appealed to the Court of Common Pleas which held the ordinance in question to be unconstitutional. The Township authorities appealed to this Court, which confirmed the unconstitutionality of the ordinance in question. Mr. Justice BELL, writing for a unanimous Court, said: "It is important to note that all of the powers granted by the Act and the Ordinance are limited—(1) they must be for the purpose of promoting the health, safety, morals or the public welfare as specifically prescribed by the Act, and (2) they may not infringe or violate any rights established by the Constitution. Appellants contend that a sliding minimum scale of habitable floor areas in residential properties, which varies in various districts, promotes the health, safety and morals of the community. . . . there was no proof that the ordinance as drawn would protect or affect any person's health or morals. Moreover, . . . it has no substantial and clearly necessary relation to safety . . .

"The natural or zealous desire of many zoning boards to protect, improve and develop their community, to plan a city . . . or a community that is both practical and beautiful, and to conserve the property values as well as the 'tone' of that community is commendable. *But they must remember that property owners have certain rights which are ordained, protected and preserved in our Constitution and which neither*

*zeal nor worthwhile objectives can impinge upon or abolish.*" In conclusion, Mr. Justice BELL wrote: "We therefore hold that neither aesthetic reasons nor the conservation of property values or the stabilization of economic values in a township are, singly or combined, sufficient to promote the health or the morals or the safety or the general welfare of the township or its inhabitants or property owners, within the meaning of the enabling Act of 1931, as amended, or under the Constitution of Pennsylvania. . . . This ordinance flies in the face of our birthright of Liberty and our American Way of Life, and *is interdicted by the Constitution.*"

In *Lord Appeal,* 368 Pa. 121, 125, this Court, again speaking through Mr. Justice BELL, stated categorically: "Both our Federal and State Constitutions provide for and *guarantee to every citizen* certain unalienable rights and liberties; and *with respect to property limit the paramount right of the Sovereign State to take an owner's land for a public use only,* and even then, only *if it pays the owner just compensation*: Fifth and Fourteenth Amendments to the Constitution of the United States; Article I, § 10, Article XVI, § 8, Constitution of Pennsylvania."

"It is now well settled that zoning acts and ordinances passed under them are valid and constitutional as structural or general legislation *whenever they are necessary for the preservation of public health, safety, morals or general welfare, and not unjustly discriminatory, or arbitrary, or unreasonable, or confiscatory in their application to a particular or specific piece of property.*" (Italics in original decision.)

Since, therefore, the ordinance in this case, as interpreted by the Majority, limits the use and enjoyment of the property in an unconstitutional manner (because it is not necessary for the preservation of

public health, morals or general welfare), I come to the inescapable conclusion that the ordinance is unconstitutional and void.

Does this decision end the current litigation? Apparently it does because, rightly or wrongly, all legal controversies eventually reach the point of no return. That, however, does not necessarily place an immovable tombstone on the living body of a living cause. Perhaps through legislative action, since judicial processes sometimes temporarily barricade the entrance to the cemeteries which will one day open to all, a way may be found to utilize the neglected farmland in Upper St. Clair Township for the most sacred purpose to which land may be dedicated—a repose for the sainted dead.